UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | **MEMORANDUM AND** |
| Plaintiff, | **ORDER** |
| - against - | 02-CV-3415 |
| ESSEX MARKETING GROUP, INC., et al. | |
| Defendants. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

PLATT, District Judge.

Before the Court is a motion by Plaintiff, Federal Trade Commission ("Plaintiff" or "FTC"), for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure against all Defendants[1] for all claims asserted in the complaint (the "Complaint"). Plaintiff's Complaint seeks injunctive and equitable relief against Essex Marketing Group, Inc. ("Essex"), Westbrook Marketing Group, Inc. ("WMG"), Westbrook Marketing Associates, LLC ("WMA"), Manhattan Vending, LLC ("MV"), Richard J. Guadagno ("Guadagno"), Jack G. Schwartz ("Schwartz"), and Henry Sanchez ("Sanchez"), (collectively, "Defendants").[2] Sanchez is the only defendant who has filed papers in opposition to the motion for summary judgment. For the

---

[1] Plaintiff's Notice of Motion does not state that summary judgment is sought against Defendant, Jack G. Schwartz. It is unclear from the Court's docket sheet whether Defendant Schwartz has been dismissed from the action.

[2] Essex, WMG, WMA and MV are apparently the same company involved in the scheme to defraud customers. Defendant Guadagno allegedly "repeatedly changed the names of the companies he was using to defraud consumers in the sale of vending machines, from Essex to WMG to WMA to MV, in an attempt to thwart the requirements of the Franchise Rule." (Ptf's Mem. at 22; See also Ptf's Mem. at 4)

following reasons, Plaintiff's motion is **DENIED** as to Defendant Sanchez and **GRANTED** as to the Defendants who have failed to file any opposition.

## BACKGROUND

### 1. Plaintiff's Claims

The FTC, an independent agency of the United States Government, alleges in the Complaint that Defendants engaged in acts that violated: (1) Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which "prohibits unfair or deceptive acts or practices in or affecting commerce," (Cmplt. at 2); and (2) the FTC's Trade Regulation Rule entitled "Disclosure requirements and prohibitions concerning franchising and business opportunity ventures" ("Franchise Rule"), 16 C.F.R.§ 436, which requires franchisors to provide prospective franchisees with a "complete and accurate basic disclosure document" containing information including the history of franchise and its principles, information about litigation and bankruptcy and the terms and conditions under which the franchise operates. (Cmplt. at 8). These charges allegedly stem from Defendants' deceptive conduct in offering for sale vending machine business opportunities by misrepresenting the income purchasers would receive and misrepresenting details regarding the delivery of purchased vending machines. (Cmplt. at 8).

## 2. Facts

The FTC alleges that beginning in January 2000, Defendants were engaged in "a series of schemes, to promote, offer to sell, and sell vending machine business opportunities." (Pl.'s Mem. Sum. J. at 5). Essex, WMA, WMG and MV ("Defendant Corporations") all used the same promotional materials and methods to promote their business scheme. (Pl.'s 56.1 Statement ¶ I.13). Defendant Corporations advertised their vending machine scheme in the classified sections of newspapers all over the nation, generally stating that they had vending machine routes for sale with significant opportunities for money potential. (Pl.'s 56.1 ¶¶ II.7-8, III.10). Employees of Defendant Corporations used sales scripts that stated profit projections and/or earnings claims that were made without any reasonable basis when speaking to potential purchasers of vending machines over the phone and in follow up promotional materials that were mailed to these individuals. (Pl.'s 56.1 ¶¶ I.21, II.9, 15, 21, 22-23, III.13-14, 16-18).

Upon purchasing vending machines, Defendant Corporations proceeded to provide purchasers with locating companies who would find locations for the vending machines (Pl.'s 56.1 ¶ I.46, II.18). Defendant Corporations also told purchasers that they could cancel their purchase if the machines were not delivered within a specified period, usually 30 days; however, some purchasers were not able to cancel their purchase when the machines were delivered late or never delivered at all. (Pl.'s 56.1 ¶¶ I.37, 39, 40, II.25-27, 31, III.20-21). As a result of the delay, many purchasers incurred significant expenses. (Pl.'s 56.1 ¶¶ I.42, II.33).

After vending machines were delivered, numerous purchasers did not receive a Franchise Disclosure Statement, required by the Franchise Rule, nor did they receive an Earnings Claim

Disclosure Document in connection with the profit projections/earning claims that were made to them by Defendant Corporations. (Pl.'s 56.1 ¶¶ I.47, 50, II.39-40, III.25-26). Numerous purchasers of Defendant Corporations' vending machines earned little or no return on their investment, even though they were promised income and profits by Defendants. (Pl.'s 56.1 ¶¶ I.36, II.38, III.19).

Defendant Guadagno was the owner of Essex, WMA, MV, and WMG, an officer of Essex, the president of WMA and WMG, and the managing member of WMA. (Pl.'s 56.1 ¶¶ II.43-47; III.4-5). In these capacities, he signed purchaser contracts, signed letters, made sales calls to prospective purchasers, was responsible for and controlled the marketing and sales of the vending machines, wrote and reviewed the sales scripts, wrote the classified ads, and ran the day-to-day business offices. (Pl.'s 56.1 ¶¶ II.48-50, 53-58, III.6, 8-12).

Defendant Guadagno initially began selling vending machine business opportunities through Essex to purchasers from approximately March 2000 to July 2000, (Pl.'s 56.1 ¶ III.7), and began selling vending machines through WMA and WMG from approximately the end of 2000 through 2001. (Pl.'s 56.1 ¶ II.3). In addition to the vending machine scheme discussed above, the FTC alleges that upon receiving calls from the purchasers who did not receive their machines within the specified contractual period, WMA and WMG would provide fake tracking numbers or tell purchasers that the vending machines were about to be delivered, when in fact they knew that to be untrue. (Pl.'s 56.1 ¶¶ II.29-30, 34). The FTC also states WMA and WMG used Proctor & Gamble's Pringles trademark in connection with the sale of vending machines without permission. (Pl.'s 56.1 ¶¶ II.16, 19).

In October 2001, MV was established as a New York limited liability company, and in

early 2002, Defendant Guadagno began selling vending machine business opportunities through MV, in addition to WMG and WMA. (Pl.'s 56.1 ¶ I.10). Defendant Sanchez was an officer of Defendant MV.

Defendants Guadagno, Essex, WMA and WMG did not respond to the FTC's motion for summary judgment, thus all statements of material facts with respect to these parties are deemed admitted. The FTC and Sanchez dispute many of the material facts relevant to Sanchez's role and knowledge of wrongful acts undertaken by MV.

## DISCUSSION

**1. Standard for Summary Judgment**

A motion for summary judgment, may not be granted unless the court determines that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Summary judgment may be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." Williams v. R.H. Donnelly Corp., 368 F.3d 123 (2d Cir. 2004). The court must resolve all ambiguities and draw all inferences in favor of the non-moving party. Id. at 255; Castle Rock Entm't, Inc. v. Carol Publ'g Group, 150 F.3d 132, 137 (2d Cir. 1998). "A party opposing a properly brought motion for summary judgment bears the burden of going beyond the [specific] pleadings, and 'designating specific facts showing that there is a genuine issue for trial.'"

Amnesty Am. v. Town of W. Hartford, 288 F.3d 467, 470 (2d Cir. 2002) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). If there is any evidence in the record from which a reasonable inference could be drawn in favor of the non-moving party on a material issue of fact, summary judgment is improper. Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994). Finally, "the judge's role in reviewing a motion for summary judgment is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

The rule with respect to an unopposed summary judgment motion is that a district court "must still assess whether the moving party has fulfilled its burden of demonstrating that there is no genuine issue of material fact and its entitlement to judgment as a matter of law." Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004). In granting summary judgment, a district court must be "[sufficiently"] clear" as to the reasons for its decision. Id.

**2. Defendant Sanchez**

In its motion for summary judgment, the FTC generally asserts that Defendant Sanchez is directly liable for his own violations of Section 5 of the FTC Act and the Franchise Rule. The FTC further argues that Defendant Sanchez is also individually liable for the Defendant Corporation's violations, namely the violations by MV of which Defendant Sanchez was a "managing member." Defendant Sanchez opposes the FTC's summary judgment motion on both liability and damages grounds. Concerning liability, Defendant Sanchez argues that "[t]he

evidence clearly shows that, at the very least, there are numerous questions of fact with respect to Sanchez's participation, control, and knowledge of the alleged business practices at Manhattan Vending." (Def's Opp. at 3)  Similarly, with respect to damages, Defendant Sanchez asserts that "at the very least, numerous questions of fact exist, precluding summary judgment, with respect to the amount of gross sales Sanchez would be responsible for, if any." (Def's Opp. at 25) Defendant Sanchez is correct.

To find a defendant individually liable for a violation of Section 5 of the FTC Act and the Franchise Rule for corporate practices, a party must demonstrate that (1) the corporate defendant violated the FTC Act or the Franchise Rule; and that (2) the individual defendant participated directly in the wrongful acts or practices *or* the individual defendant had authority to control the corporate defendant, and the individual defendant knew of the wrongful acts or practices.  FTC v. Five-Star Automobile Club, Inc., 97 F.Supp.2d 502, 535 (S.D.N.Y. 2000).  Authority to control a company is evidenced by active involvement with business matters and corporate policy including assumption of officer duties.  Consumer Sales Corp. v. Federal Trade Commission, 198 F.2d 404, 408 (2d Cir. 1952); See also Rayex Corp. v. Federal Trade Commission, 317 F.2d 290, 295 (2d Cir. 1963) (noting that participation or control may exist when an individual is a substantial stockholder, vice-president, and is required during the president's absence to perform all his duties and exercise all his powers);  FTC v. Publishing Clearing House, 104 F.3d 1168, 1170 (9th Cir. 1997) (finding liability when an individual assumed the role of president and had authority to sign documents on behalf of the corporation).

Further, Section 5's knowledge requirement "may be fulfilled by showing that the individual had 'actual knowledge of material misrepresentations, reckless indifference to the

truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.'" Five-Star Auto Club, 97 F.Supp. at 535.

The evidence presented in this case raises a relevant issue of fact as to Defendant Sanchez's direct participation in the alleged wrongful acts or his alleged authority to control the corporate defendant, MV.  Specifically, the FTC lists the following evidence to support its claim that Defendant Sanchez either directly violated the FTC Act or had authority to control MV:

- Sanchez signed letters to MV purchasers as MV's managing member. (Fact 61)

- Sanchez signed Certificates of "Vandalism and Theft Insurance" as MV's "Executive" and admits that those Certificates were distributed to MV's products purchasers.  (Fact 62)

- Sanchez signed MV payroll and commission checks as its managing member.  (Fact 72)

- Sanchez maintained MV's payroll records, made bank deposits and wire transfers on behalf of MV, paid the advertising agency, and was responsible for placing MV advertisements.  (Facts 73, 74, 75)

- Sanchez knew the first page of the promotional materials on MV's website was signed "With Warm Regards, Henry Sanchez, President," and he made no attempt to verify the accuracy of the information on this website. (Facts 77, 78)

- Sanchez reviewed and completed state and federal franchise disclosure forms on behalf of MV, which listed him as the managing member of MV. (Fact 88, TRO Ex. G)

(Ptf. Mem. at 8)  Conversely, Defendant Sanchez disputes that he either personally violated the

FTC Act or had the authority to control MV, by setting forth the following evidence:

- An MV salesman testified that Sanchez was merely an investor in MV, and had no authority in the company. (Ex. B at pp. 21, 34-35) The salesman testified that while Guadagno held Sanchez out as the "managing member," this title existed in name only. (Id.)

- No signed operating agreement exists which designates Sanchez as a member, much less a managing member.

- Before Sanchez arrived at Manhattan Vending, Guadagno announced to the company that, although Sanchez would be investing in the company, Guadagno would still be retaining all control over the company. (Ex. B at pp. 21, 34-35). Guadagno made it clear that Sanchez was merely a "silent investor" with no control in the company. (Id.)

- MV salesmen testified that Sanchez had no involvement with writing sales scripts. (Ex. B at pp. 36-39) Sanchez had no authority to hire or fire employees. (Id.) Sanchez had no role in the advertising of the company. (Id.) Sanchez did not oversee any of the sales force. (Ex. B at 36; Ex. C. at 34-35)

- According to MV employees, Sanchez was merely given an office in order to placate him since he was an investor of MV, and the only thing Sanchez did at the company was play computer card games and "nothing else." (Ex. B. at 38; Ex. C. at 34-35, 58; Ex. D at 16-17)

- According to the sales manager, when Sanchez may have first learned of Guadagno's schemes, Guadagno physically threatened him and "Henry Sanchez left his office so fast and never came back." (Ex. B. at 46-47). According to the sales manager, he was "scared. I mean to death." (Ex. B. at 47)

- Sanchez was not even allowed to talk to anyone in the sales force, that was done only by Richard Guadagno. (Ex. B at 58; Ex. C at 29)

The FTC insists that Defendant Sanchez failed to dispute at all or does not adequately dispute numerous facts set forth in plaintiff's Rule 56.1 statement because he either does not specifically controvert the facts or does not support his dispute with admissible evidence. (Ptf's Reply Mem. at 2) Contrary to the FTC's argument, the evidence adduced by Defendant Sanchez (which includes references to admissible deposition testimony of MV salesmen and MV's sales manager) raises an issue of fact concerning Defendant Sanchez's direct participation in the alleged fraudulent acts or his authority to control MV. See, e.g., Federal Trade Commission v. P.M.C.S., Inc., 21 F.Supp.2d 187, 192 (E.D.N.Y. 1998) (finding that fact issues existed that precluded summary judgment when defendants disputed the extent to which they participated in the alleged FTCA and Franchise Rule violations, and the extent to which one defendant actually controlled or had the authority to control the corporation); Cf. Publishing Clearing House, 104 F.3d at 1170 (9th Cir. 1996) (finding on summary judgment that the defendant's assumption of the role of president and her authority to sign documents demonstrated the requisite control over the corporation, when the defendant offered no evidence to rebut the showing of control). Therefore, FTC's motion for summary judgment with respect to Defendant Sanchez is denied.

### 3. Other Defendants

A District Court "may not grant the [summary judgment] motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." Vt. Teddy Bear Co., 373 F.3d at 244. Because no material issue of fact remains, FTC's summary judgment motion with respect to the remaining

defendants is granted.

Plaintiff's unopposed 56.1 Statement sets forth sufficient facts for this Court to conclude that the remaining defendants violated Section 5 of the FTC Act as well as the Franchise Rule. Defendant Guadagno, through his complete and total control of the Defendant Corporations, engaged in a scheme whereby defendants engaged in deceptive conduct in offering for sale vending machine business opportunities by misrepresenting the income purchasers would receive and misrepresenting details regarding the delivery of purchased vending machines. In his capacity as an owner of the Defendant Corporations, he signed purchaser contracts, signed letters, made sales calls to prospective purchasers, was responsible for and controlled the marketing and sales of the vending machines, wrote and reviewed the sales scripts, wrote the classified ads, and ran the day-to-day business offices. (Pl.'s 56.1 ¶¶ II.48-50, 53-58, III.6, 8-12). Furthermore, Defendant Guadagno has pled guilty in a criminal proceeding challenging this same conduct.

## **CONCLUSION**

For the foregoing reasons, FTC's motion for summary judgment with respect to Defendant Sanchez is **DENIED** and FTC's motion with respect to all other Defendants is **GRANTED**.

SO ORDERED.

 /s/
Thomas C. Platt, U.S.D.J.

Dated: Central Islip, New York
July 8, 2008